UNITED STATES BANKRUPTCY COURT      **NOT FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------X

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 7 |
| FELIPA P. MAGUNDAYAO, | : | Case No. 03-12711 (SMB) |
| | : | |
| Debtor. | : | |

---------------------------------------------X

| | | |
|---|---|---|
| CHARLES M. WEISS, INC., | : | |
| | : | |
| Plaintiff, | : | Adv. Pro. No. 04-4330 (SMB) |
| | : | |
| - against - | : | |
| | : | |
| FELIPA P. MAGUNDAYAO, | : | |
| | : | |
| Defendant. | : | |

--------------------------------------------- X

## POST-TRIAL OPINION AND ORDER

**A P P E A R A N C E S :**

**DOUGLAS J. PICK & ASSOCIATES**
Attorneys for Plaintiff
350 Fifth Avenue, Suite 3000
New York, New York 10118

       Douglas J. Pick, Esq.
         Of Counsel

DAVID B. SHAEV, ESQ.
Attorney for Defendant
350 Fifth Avenue, Suite 7210
New York, New York 10118

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge**

The plaintiff, Charles M. Weiss, Inc., filed this adversary proceeding to revoke the discharge previously granted to the Debtor, Felipa P. Magundayao. The plaintiff primarily argued that the Debtor failed to disclose significant assets in her Schedules and Statement of Financial Affairs ("SOFA"). The Court conducted a two day trial during which it heard the testimony of four witnesses and received numerous documentary exhibits. For the reasons that follow, the Court concludes that the Debtor's discharge must be revoked.

## BACKGROUND

The Debtor is a dentist. She graduated from the New York University's dental school in 1984, and since 1985, has operated a dental practice through professional corporations under the names Felipa P. Magundayao, Inc., Beyond Smile, Inc., Dr. Fe P. Magundayao Dental Offices and Felipa P. Magundayao D.M.D.P.C. (the "Non-Debtor Entities") (Joint Pre-Trial Order, dated June 14, 2005 ("JPTO") at ¶ E.4)(ECF Doc. # 18.)[1]  On the petition date, she resided in a house located at 190 Cherry Lane, Teaneck, New Jersey (the "Teaneck House"). (Transcript of Trial, held June 24, 2005 ("6/24/05 Tr.") at 11.) At all relevant times, the Debtor maintained her offices at 405 Lexington Avenue, New York, New York (the Chrysler Building) in space she subleased from the plaintiff. (See id. at 20-21.) The sublease was renewed by the Debtor from time to time. (See Id.

---

[1]      Paragraph E of the JPTO contains facts stipulated by the parties to be undisputed. Future citations to the JPTO refer to this section.

at 201.)  The most recent sublease was scheduled to terminate on December 31, 2006.  (See Id.)

This is the Debtor's third bankruptcy case in this Court.  She filed her first chapter 7 bankruptcy petition (Case no. 96-45936) on November 4, 1996. (See Defendant's Exhibit ("DX") 1.)  According to Schedule E filed in that case, the Debtor owed $194,649 in federal income taxes that had accrued between 1990-95.  According to Schedule F, she owed only $12,157.53 in unsecured debt.  The Debtor filed a second bankruptcy case (Case no. 98-45864) on August 13, 1998, but no records relating to the second bankruptcy were offered at trial.

The Debtor filed the current chapter 7 case on April 30, 2003.  Kenneth P. Silverman, Esq., was appointed interim chapter 7 trustee, and thereafter became the permanent chapter 7 trustee by operation of law.  (JPTO at ¶ 2.)  The Debtor's Schedules listed, inter alia, assets valued at $39,150, priority tax liabilities in the sum of $60,809.47, and unsecured debt in the sum of $645,858.64.[2]    A substantial portion of the unsecured (non-priority) debt included the federal tax debt listed in the 1996 petition.  The older taxes had not been discharged and remained unsatisfied.  The Schedules also listed substantial federal and New York

---

[2]       The Petition, Schedules and Statement of Financial Affairs were marked for identification and received in evidence as Plaintiff's Exhibit ("PX") 13.  With one exception which is not relevant, the Plaintiff's Exhibits were also received en masse as "Joint Exhibits." (6/24/05 Tr. at 196.)  This opinion refers to the Joint Exhibits as the Plaintiff's Exhibits.

state tax debt that had accrued after the 1996 filing but more than three years before the current petition date.  In short, the Debtor owed a significant amount of taxes dating back to before her 1996 petition.

On May 7, 2003, the Clerk of the Court mailed a Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors & Deadlines (the "Notice") to all of the parties identified in Schedules "D", "E" and "F" advising them, <u>inter alia</u>, that August 4, 2003, had been set as the last date for creditors to file complaints objecting to the Debtor's discharge and/or for determinations as to the dischargeability of the Debtor's obligations.  (<u>See</u> PX 17; JPTO at ¶ 6.)  Because neither plaintiff nor its principal, Dr. Charles Weiss, had been listed as a creditor or included on the mailing matrix prepared by the Debtor, the Notice was not sent to them.  In fact, the Debtor was apparently current on the rent as of the petition date.

The Debtor's sublease with the plaintiff was deemed rejected by operation of law 60 days after the petition date.  <u>See</u> 11 U.S.C. § 365(d)(4).  Despite the rejection, the Debtor continued to occupy her offices in the Chrysler Building and paid post-petition rent under the sublease through December 31, 2003.  (JPTO at ¶ 7.)  By letter dated January 7, 2004, the Debtor's counsel advised the plaintiff that the Debtor had filed a chapter 7 bankruptcy petition, and would not continue with the sublease, effective February 1, 2004.  (JPTO at ¶ 8.)  This was the first

4

that the plaintiff learned of the bankruptcy.  (See 6/24/05 Tr. at 237; Transcript of Trial, held June 27, 2005 ("6/27/05 Tr.") at 36).  On January 23, 2004, the Debtor filed Amended Schedules adding the plaintiff to Schedule "F" as a general unsecured creditor in an "unknown" amount.  (PX 16; JPTO at ¶ 9).

On March 22, 2004, the Court entered an order discharging the Debtor from all of her pre-petition debts (the "Discharge").  (JPTO at ¶10.)  On or about April 7, 2004, the plaintiff moved pursuant to FED. R. CIV. P. 60(b) to vacate the Discharge and for an extension of time to file a complaint objecting to the Debtor's discharge.  By Memorandum Decision dated August 16, 2004, the Court denied the plaintiff's motion without prejudice to its right to commence an adversary proceeding to revoke the Debtor's discharge under § 727(d) of the Bankruptcy Code.  In re Magundayao, 313 B.R. 175 (Bankr. S.D.N.Y. 2004).

On or about October 7, 2004 the plaintiff filed its complaint to revoke the Discharge pursuant to 11 U.S.C. § 727(d)(1).  (PX 46).  The complaint charged, in substance, that the Debtor had failed to disclose the existence of assets or other material information in her Petition, Schedules and SOFA, and the plaintiff did not learn about the Debtor's fraud until after the Discharge was deemed to have been issued.  The Debtor's answer, (PX 47), denied the material allegations of the complaint.

## DISCUSSION

### A.    Introduction

Section 727 governs the revocation of a discharge issued by the bankruptcy court.  Section 727(d)(1), on which the plaintiff relies, states:

> On request of the trustee, a creditor, or the United States trustee, and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if - (1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge.

The creditor bears the burden of proving each element by a preponderance of the evidence.  Citibank, N.A. v. Emery (In re Emery), 201 B.R. 37, 40-41 (E.D.N.Y. 1996), aff'd, 132 F.3d 892 (2d Cir. 1998); cf. Grogan v. Garner, 498 U.S. 279, 286 (1991)(addressing the burden of proof under 11 U.S.C. § 523(a)).

### 1.    Knowledge of the Fraud

The facts of this case highlight an anomaly in the second prong of § 727(d)(1).  The plaintiff learned of the bankruptcy in January 2004, approximately two months before the Discharge actually issued.  The plaintiff had ample time to review the Debtor's submissions, and discover the misstatements and omissions during the interim.  Arguably, the plaintiff knew of the Debtor's fraud prior to the grant of the Discharge.

Yet, by the time that the plaintiff learned about the bankruptcy, it was too

late to object.  The deadline for filing an objection to discharge runs 60 days after

the date first set for the § 341(a) meeting of creditors.  FED. R. BANKR. P. 4004(a).

The § 341(a) meeting was held on June 3, 2003, and the deadline to object to

discharge ran out on August 4, 2003.  Thus, a literal reading of Rule 4004(a) and

§ 727(d)(1) compels the conclusion that the plaintiff's right to object to the

Discharge ran out before it ever learned of the underlying fraud, while its right to

seek to revoke the Discharge is barred because it learned of the fraud prior to the

issuance of the Discharge.

   This is not the result that Congress intended.  Section 727(d)(1) was

designed to disqualify a creditor who could have objected to the discharge before

it issued, but failed to do so.  Werner v. Puente (In re Puente), 49 B.R. 966, 968

(Bankr. W.D.N.Y. 1985); 6 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON

BANKRUPTCY ¶ 727.15[3], at 727-76 (15th ed. rev. 2005).  In the usual case, the

literal application of § 727(d)(1) is straightforward.  Once the 60 day deadline to

object to the discharge expires, and with certain exceptions that are not relevant,

the bankruptcy court must issue the discharge.  See FED. R. BANK. P. 4004(c).[3]

---

[3]      Federal Bankruptcy Rule 4004(c) states:

(1) In a chapter 7 case, on expiration of the time fixed for filing a complaint
objecting to discharge and the time fixed for filing a motion to dismiss that case
under Rule 1017(e), the court shall forthwith grant the discharge unless:

(A) the debtor is not an individual,

(B) a complaint objecting to the discharge has been filed,

(C) the debtor has filed a waiver under § 727(a)(10),

The 60 day period gives creditors ample time to object to the discharge, or to seek an extension of the objection deadline.

Here, the Discharge should have issued immediately after August 4, 2003. Had the Discharge issued under the Rule's mandate, the plaintiff would not have learned of the fraud until after that date.  In this case, however, the Clerk failed, for whatever reason, to follow the Rule.  The question is whether the plaintiff should be time-barred from challenging a discharge that should have issued before it ever learned of the bankruptcy.

The Second Circuit Court of Appeals answered this question in <u>Citibank, N.A. v. Emery (In re Emery)</u>, 132 F.3d 892 (2d Cir. 1998).  On the same facts presented in this case, the Court ruled that for the purpose of § 727(d)(1), the discharge is deemed to have issued when it should have issued rather than when it actually issued.  Consequently, a creditor who discovers the debtor's fraud

---

(D) a motion to dismiss the case under § 707 is pending,

(E) a motion to extend the time for filing a complaint objecting to the discharge is pending,

(F) a motion to extend the time for filing a motion to dismiss the case under Rule 1017(e)(1) is pending, or

(G) the debtor has not paid in full the filing fee prescribed by 28 U.S.C. § 1930(a) and any other fee prescribed by the Judicial Conference of the United States under 28 U.S.C. § 1930(b) that is payable to the clerk upon the commencement of a case under the Code.

between those two dates can still file a timely adversary proceeding to revoke the discharge.  Id. at 896-97.


Here, the plaintiff demonstrated that it did not learn about the Debtor's bankruptcy until January 2004.  The Debtor did not list the plaintiff as a creditor, and the Clerk did not mail the plaintiff a copy of the Notice.  In addition, the Debtor continued to occupy the leased premises and paid rent through the end of December 2003, several months after the lease was deemed rejected as a matter of law, and should have been surrendered to the plaintiff.  See 11 U.S.C. § 365(d)(4)(upon rejection, "the trustee shall immediately surrender such nonresidential real property to the lessor").


Furthermore, although the plaintiff waited until three months after it learned of the bankruptcy case before it moved to vacate the Discharge, the delay was immaterial.  The Discharge did not actually issue until March 22, 2004, and the plaintiff made its Rule 60(b) motion less than three weeks later.  There was no reason to make the motion unless and until the Discharge actually issued. Moreover, the delay did not cause any prejudice to the Debtor.


Accordingly, The plaintiff's complaint was timely under the second prong of § 727(d)(1), and we turn to the first prong.

## 2.    The Debtor's Fraud

"In order to have a discharge revoked for reasons of fraud the debtor must have committed a fraud in fact that if known to the court prior to the discharge would have barred the discharge." Artinian v. Peli (In re Peli), 31 B.R. 952, 955 (Bankr. E.D.N.Y. 1983); accord White v. Nielsen (In re Nielsen), 383 F.3d 922, 925 (9th Cir. 2004); Lawrence Nat'l Bank v. Edmonds (In re Edmonds), 924 F.2d 176, 180 (10th Cir. 1991); Marshall v. Wilson (In re Wilson), No. 99-13695, 2002 WL 1067450, at *4 (Bankr. D.N.H. May 28, 2002); Citibank, N.A. v. Emery (In re Emery), 170 B.R. 777, 782 (Bankr. E.D.N.Y. 1994), rev'd on other grounds, 201 B.R. 37 (E.D.N.Y. 1996), aff'd, 132 F.3d 892 (2d Cir. 1998). Proof that the debtor incurred a debt through fraud, rendering the debt non-dischargeable under § 523(a), is insufficient.[4]  In re Wilson, 2002 WL 1067450, at *4.

Here, the plaintiff contended, in the main, that the Debtor made a false oath in her Petition, Schedules or SOFA in violation of 11 U.S.C. § 727(a)(4)(A).[5]

---

[4]    Several of the grounds relied on by the plaintiff fell into this category. They primarily involved false statements made before the case in connection with the ownership of the Teaneck House. The statements may have fraudulently induced mortgage lenders to extend loans, but do not provide a basis to revoke the discharge. The Debtor's false statements are nevertheless highly relevant on the issue of whether the Debtor owned an equitable interest in the Teaneck House. This issue is discussed at length in the succeeding text.

[5]    The plaintiff also charged that the Debtor failed to preserve records in violation of § 727(a)(3), or to satisfactorily explain a loss or deficiency of her assets in violation of § 727(a)(5). Neither statutory provision requires proof of fraud. Hence, they do not support a revocation of the Discharge, even if they provided a basis for denying the Discharge in the first instance.

10

Section 727(a)(4)(A) denies a discharge to the debtor who knowingly makes a material, false statement with fraudulent intent. <u>Dubrowsky v. Perlbinder (In re Dubrowsky)</u>, 244 B.R. 560, 572 (E.D.N.Y. 2000); <u>Nof v. Gannon (In re Gannon)</u>, 173 B.R. 313, 319 (Bankr. S.D.N.Y. 1994); <u>Zitwer v. Kelly (In re Kelly)</u>, 135 B.R. 459, 461 (Bankr. S.D.N.Y. 1992); <u>New World Restaurant Group, Inc. v. Abramov (In re Abramov)</u>, No. 03-1688-608, 2005 WL 2126146, at *5 (Bankr. E.D.N.Y. Aug. 31, 2005). A statement is material under § 727(a)(4)(A) if it bears on the discovery of estate property or the debtor's business dealings. <u>Gannon</u>, 173 B.R. at 319-20; <u>see</u> <u>Wilson</u>, 2002 WL 1067450, at *6. A debtor's petition, schedules and statement of financial affairs constitute "statements" for the purposes of § 727(a)(4)(A). <u>Gannon</u>, 173 B.R. at 320. Furthermore, reckless indifference to or disregard of the truth is the equivalent of fraud for the purposes of § 727. <u>In re Chavin</u>, 150 F.3d 726, 728 (7th Cir. 1998)(Posner, J.); <u>Gannon</u>, 173 B.R. at 320; <u>Wilson</u>, 2002 WL 1067450, at *6; <u>cf.</u> <u>In re Diorio</u>, 407 F.2d 1330, 1331 (2d Cir. 1969) ("Successful administration of the Bankruptcy Act hangs heavily on the veracity of statements made by the bankrupt; . . .reckless indifference to the truth . . .is the equivalent of fraud.")

The plaintiff identified many items that the Debtor failed to disclose accurately or disclosed not at all in her Petition, Schedules and SOFA. A few were insignificant or <u>de minimis</u>, and the record does not support a finding that they were done with fraudulent intent. Others were more significant. The balance of

this opinion deals with three violations of § 727(a)(4)(A) that mandate the revocation of the Discharge. Consequently, it is unnecessary to address the other numerous shortcomings identified by the plaintiff.

**B.      The Teaneck House**

As noted, the Debtor resided in the Teaneck House when this bankruptcy case was commenced. The property had been acquired, by Deed dated November 7, 1998 (the "1998 Deed"), in the name of the Debtor's parents, Pablo B. Magundayao ("Pablo") and Necifora Magundayao ("Necifora"), and the Debtor's sister, Flora Magundayao ("Flora"). (See PX 49.) The purchase price was $295,000. (See 6/24/05 Tr. at 29.)

Pablo and Necifora Magundayao made the down payment. (See id. at 30.) The Debtor testified that Flora was added to the 1998 Deed solely because the Debtor's parents were "too old to have such a mortgage and they were afraid they needed a younger co-signor so they had requested my sister." (Id.) The Debtor was not included on the 1998 Deed because she had "bad credit". (See id; 6/27/05 Tr. at 78.)

The acquisition of the Teaneck House did not raise any red flags. The subsequent mortgaging, inter-family transfer, refinancing and ultimate sale, however, was tainted by forgery and fraud.

12

## 1.    The Original Mortgage

The balance of the purchase price for the Teaneck House was funded with a mortgage loan from Norwest Mortgage, Inc.  On December 10, 1998 a mortgage in the amount of $265,000.00 in favor of Norwest was placed on the Teaneck House.  (PX 50.)  The "Mortgagors," according to the mortgage, were "Flora F. Magundayao, 'a single person,' and Necifora P. Magundayao and Pablo B. Magundayao, wife and husband." (Id.)

Flora never actually signed the mortgage although her signature appeared on it.  Instead, the Debtor signed Flora's name.  The Debtor testified that she signed with Flora's permission, but conceded that she did not have a power of attorney. (See 6/24/05 Tr. at 31-32.)  The Debtor insisted that she supplied proof of her own identity at the closing, (see id. at 32), but the notarial acknowledgment on the mortgage indicated that Flora appeared personally and signed in the notary's presence.  (See PX 50.)

## 2.    The Inter-Family Transfer and Refinancing

Toward the end of 2002, the Debtor, with her mother's and Flora's ostensible consent, decided to refinance the mortgage.  Meritage Mortgage Corp. ("Meritage"), the prospective mortgagee, applied for title insurance from the Stewart Title Guaranty Company ("Stewart Title") in connection with the application for a $320,000 mortgage secured by the Teaneck House.   On

13

December 12, 2002, Stewart Title issued a closing service letter. (DX 10, at p. 1.) Its commitment was conditioned, <u>inter alia</u>, on the delivery and recordation of a deed from Necifora and Flora and Andre Kupfermunz, "wife and husband," to Necifora and Flora. (<u>Id.</u> at p. 5.) On or about December 26, 2002, a deed (the "2002 Deed") was executed, by "NECIFORA MAGUNDAYAO, WIDOW, <u>FLORA F. MAGUNDAYAO AND ANDRE KUPFERMUNZ, WIFE AND HUSBAND</u>," transferring title to "FLORA F. MAGUNDAYAO." (PX 42)(Emphasis added.) Necifora did not retain an interest, but the 2002 Deed otherwise met Stewart Title's requirement.

The 2002 Deed was rife with misstatements. Kupfermunz, who did not appear in the chain of title, was married to the Debtor, not Flora (<u>see</u> 6/24/05 Tr. at 36, 38); Flora never resided at 190 Cherry Lane, Teaneck, New Jersey (<u>see</u> <u>id.</u> at 40); and Kupfermunz, who was separated from the Debtor, did not reside at 190 Cherry Lane, Teaneck, New Jersey, in December, 2002. (<u>See</u> <u>id.</u>).

Moreover, except for Necifora's signature, the 2002 Deed was an utter forgery. Kupfermunz never signed the deed, and did not know about the transaction until the trial. (6/27/05 Tr. at 55, 60, 63-64.) The Debtor again signed Flora's name on the 2002 Deed. Although she insisted that she did so pursuant to a verbal understanding, she lacked a power of attorney. (6/24/05 Tr. at 39.)

14

The Debtor's lack of any significant memory of the transaction was also remarkable. She did not know why Kupfermunz's name was added to the 2002 Deed, (see 6/24/05 Tr. at 39), or who signed his name. (See id. at p. 43.) She could not remember the purpose for the 2002 Deed. (See id. at 41-42, 48 and 51.) She could not recall if Kupfermunz was at the closing. (See id. 42, 44.) She could not answer where or when the 2002 Deed was signed. (See id. at 44.)

A rationale for the 2002 Deed nevertheless emerged at the trial. New Jersey law grants a non-titled spouse a right to live in the marital home – a right of possession. See N.J. STAT. ANN. § 3B:28-3.[6] Kupfermunz and the Debtor were still

---

[6]    Section 3B:28-3 entitled "Joint occupancy of principal matrimonial residence; alienation," states:

> a.    During life every married person shall be entitled to joint possession with his or her spouse of any real property which they occupy jointly as their principal matrimonial residence and to which neither dower nor curtesy applies. One who acquires an estate or interest in real property from a person whose spouse is entitled to joint possession thereof does so subject to such right of possession, unless such right of possession has been released, extinguished or subordinated by such spouse or has been terminated by order or judgment of a court of competent jurisdiction or otherwise.
>
> b.    Nothing contained herein shall be construed to prevent the release, subordination or extinguishment of the right of joint possession by either spouse, by premarital agreement, separation agreement or other written instrument.
>
> c.    The right of joint possession shall be extinguished by the consent of both parties, by the death of either spouse, by judgment of divorce, separation or annulment, by other order or judgment which extinguishes same, or by voluntary abandonment of the principal matrimonial residence.

N.J. STAT. ANN. § 3B:28-3 (Thomson/West 2005).

Pg 16 of 33

married though living apart in December 2002,[7] and Kupfermunz might have been able to exercise a right of possession.

Kupfermunz could, however, voluntarily relinquish the right of possession by written instrument. See N.J. STAT. ANN. § 3B:28-3(b)(quoted in margin). The 2002 Deed purported to accomplish a voluntary waiver by Kupfermunz:

> The purpose of this Deed is to specifically convey, waive and relinquish to and in favor of Grantee, FLORA F. MAGUNDAYAO, who is the spouse of Andre Kupfermunz, all of Grantor's right, title and interest, all marital rights to said property and any right of joint possession which has now or may hereafter acquire in and to the property as a principal matrimonial residence together with any survivorship right arising from the premises, being, to be, or having been the principal marital residence of the parties, within the contemplation of the applicable Statute, N.J.S.A. 3B:28-3.

(PX 42.)

The Debtor did not come up with this idea on her own. Stewart Title demanded it, but its demand made no sense unless the Debtor had told Meritage or Stewart Title that she was Flora, she was married to Kupfermunz, and she owned the Teaneck House.

The original mortgage was refinanced one month later. In January 2003, the Debtor submitted a Uniform Residential Loan Application to Meritage. (PX

---

[7]   Their marriage was annulled by a judgment of the Supreme Court of the State of New York, County of New York, dated Apr. 21, 2003 and filed three days later. (DX 9.)

26.)  According to the Application, "Flora" sought to borrow $317,000.  Of that sum, $277,124.22 was needed to satisfy the existing mortgage and closing costs. The balance of the approximate $40,000 of proceeds, plus the proceeds of a second mortgage in the sum of $60,000, were to be paid to the borrower – Flora.

The relevant papers purposely confused the separate identities of Flora and the Debtor.  The Debtor again signed Flora's name to the Loan Application despite the lack of a power of attorney.  (See 6/24/05 Tr. at 76.)  The Loan Application stated that "Flora" was an associate dentist employed by Beyond Smile Inc. (whose name and phone number were provided).  Flora was a physical therapist, not a dentist; the Debtor was a dentist.  The Loan Application also stated that "Flora" earned $10,000 per month – the same amount as the Debtor's monthly draw. Finally, the application stated that "Flora" was married and lived in the Teaneck House.  Flora was divorced and lived in Illinois; the Debtor was married and lived in the Teaneck House.

Meritage approved the Application, and funded both loans.  On January 27, 2003, a new first mortgage was placed on the Teaneck Home in the amount of $317,000 (the "$317,000 Mortgage").  The "Borrower" on the $317,000 Mortgage was "Flora F. Magundayao, Married."  (PX 49.)  The Debtor admitted that she signed Flora's name to the $317,000 Mortgage, (see 6/24/05 Tr. at 50; see PX 49), but lacked a power of attorney.  (See 6/24/05 Tr. at 54).

17

On the same date, a second mortgage was placed on the Teaneck Home for $60,000 (the "$60,000 Mortgage"). (PX 44, 49.) The Debtor admitted that she also signed Flora's name on the $60,000 Mortgage despite the lack of a power of attorney. (See 6/24/05 Tr. at 53; see PX 44, 49.) Although the Debtor testified that she provided her own ID at the closing of the two mortgages, (see 6/24/05 Tr. at p. 55), the notarial acknowledgments indicated that "Flora" signed the documents.

The refinancing generated $99,698.01 in net proceeds for the "Borrower." Flora was entitled to the net proceeds as the "Borrower" and the sole legal owner of the Teaneck House. The Debtor testified, however, that Flora gave her the $99,698.01 as a "gift"; Flora endorsed the net proceeds check, and Flora deposited the funds into the Debtor's business account. (See 6/24/05 Tr. at 52, 54, 57; see DX 13.) According to the Fleet Bank statement, dated Feb. 28, 2003, $99,698.01 was deposited into the account of "Dr. Fe P. Magundayao Dental Offices PC DBA Beyond Smile" on February 3, 2003. (See DX 4.)

### 3.    The Post-Petition Sale

The Debtor filed this case two months later, on April 30, 2003. On June 25, 2004, the Debtor signed her sister's name to a contract to sell the Teaneck House for $460,000. (See PX 31.) This time, Flora actually signed some of the transactional documents, including a power of attorney that appointed the Debtor

as her attorney-in-fact, (PX 33), an affidavit or title, (PX 34), and a 1099-S

Reporting Form. (PX 40.) The latter included a certification by Flora, made under

penalty of perjury, that the transaction was a non-taxable event and did not have

to be reported to the Internal Revenue Service, because, <u>inter alia</u>, Flora owned

and occupied the Teaneck House during two of the last five years.    The

certification was false.

The sale transaction closed in late August 2004. (<u>See</u> 6/24/05 Tr. at 56.)

The net proceeds of the sale were made payable to Flora in two checks aggregating

$29,793.79. The first, in the sum of $7,132.46, was dated August 27, 2004. (<u>See</u>

PX 3.) The second, in the sum of $22,661.33, was dated August 30, 2004. (<u>See</u>

PX 4.) The Debtor testified that the checks were sent to Flora in Illinois (<u>see</u>

6/24/05 Tr. at 82, 127), Flora endorsed and returned the checks by FedEx to the

Debtor, (<u>see</u> <u>id.</u> at p. 57, 81-83), and the Debtor deposited the checks in her

business account. (<u>Id.</u> at 81-83.)

In truth, Flora never touched the sale proceeds.  The Fleet Bank records

pertaining to the Debtor's business account show that the $7,132.46 check was

deposited on August 27, 2004, the date it was written.  The $22,661.33 check was

deposited on August 31, 2004, one day after it was written.  The Debtor could not

have sent the checks by Federal Express to Flora, and awaited their return, and

then deposited them, either on the day they were written or only one day later.

This leads to but one inference – the Debtor forged Flora's endorsement and immediately deposited the checks into her business account.[8]

In any event, the Debtor admitted that she got the profit from the sale. Furthermore, the Debtor conceded that she used all of the money from the refinancing and the sale to finance the construction of her new dental office, (id. at 72), or prepay one year of rent on a cottage that the she had leased. (Id. at 83.)

## 4.    The Debtor's Interest In The Teaneck House

The substance of the plaintiff's claim is that the Debtor had an equitable or beneficial interest in the Teaneck House that she intentionally failed to disclose in her Schedules and SOFA. A "beneficial owner" is "[o]ne recognized in equity as the owner of something because use and title belong to that person, even though legal title may belong to someone else." BLACK'S LAW DICTIONARY 1137 (8th ed. 2004). The Debtor's interest in the Teaneck House must be decided under state law. See Butner v. United States, 440 U.S. 48, 55 (1979); Town of Weathersfield v. Merchants Bank (In re Canney), 284 F.3d 362, 370 (2d Cir. 2002); Morton v. National Bank of New York City (In re Morton), 866 F.2d 561, 563 (2d Cir. 1989).

The Teaneck House is located in New Jersey, and hence, the Debtor's

---

[8]        This conclusion is also consistent with the Debtor's deposition testimony where she stated that she had endorsed Flora's name on the back of the checks. (See 6/24/05 Tr. at 126-27).

interest must be decided under New Jersey law.[9]  The parties did not brief this issue, and the Court's own research failed to disclose New Jersey authority on point.  The case does not fit within the usual paradigm in which a Debtor provides the consideration for the purchase of property but places title in another to hinder her creditors.  Here, the Debtor's parents made the down payment.

Nevertheless, at least one court has held, on similar facts, that the debtor failed to disclose his beneficial interest in real property, and affirmed the denial of his discharge.  In Keeney v. Smith (In re Keeney), 227 F.3d 679 (6th Cir. 2000), two tracts of real estate were purchased in the name of the debtor's parents.  The debtor did not make the down payment on the first tract, but either he or his

----

[9]        "[B]ankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state."  Bianco v. Erkins (In re Gaston & Snow), 243 F.3d 599, 601-02 (2d Cir.), cert. denied, 534 U.S. 1042 (2001).  Federal common law choice of law rules should be applied, however, to issues arising out of federal law, especially if the controversy implicates "important federal bankruptcy policy."  Koreag, Controle et Revision S.A. v. Refco F/X Assocs. (In re Koreag, Controle et Revision S.A.), 961 F.2d 341, 350 (2d Cir. 1992), cert. denied, 506 U.S. 865.  In the absence of Congressional guidance, federal choice of law rules often follow the RESTATEMENT (SECOND) OF CONFLICT OF LAWS.  See Pescatore v. Pan Am. World Airways, Inc., 97 F.3d 1, 12 (2d Cir.1996) (citing Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n, 731 F.2d 112, 121 (2d Cir.1984).

        Here, no conflict exists between the federal common law and New York choice of law rules.  The RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 235(1) (2005) provides that "[t]he existence and extent of an equitable interest in land are determined by the law that would be applied by the courts of the situs."  The New York choice of law rules provide that the nature of an interest in real property is governed by the law of the place where the property is located.  El Cid, Ltd. v. New Jersey Zinc Co., 575 F. Supp. 1513, 1517 (S.D.N.Y. 1983), aff'd without op., 770 F.2d 157 (2d Cir.), cert denied, 474 U.S. 1021 (1985); Carrolton Assoc. v. Abrams, 293 N.Y.S.2d 159, 168 (N.Y. Sup. Ct. 1968) (Matthew M. Levy, J.).  Under either approach, the law of New Jersey will determine the Debtor's interest in the Teaneck House.

corporation made all of the mortgage payments.  In addition, he and his then-wife

lived on the property for one year, but paid his parents no rent.  The debtor's

parents eventually sold the property for $15,000, and turned the proceeds over to

the mortgagee.  Id. at 682.  The second tract followed a similar pattern, except

that the debtor or his corporation also paid the down payment, and the debtor

lived on the property on the petition date.  Id.  The bankruptcy court denied the

discharge, concluding that the debtor had concealed his beneficial interest in both

properties in violation of 11 U.S.C. 727(a)(2)(A), and failed to disclose his interest

in his bankruptcy schedules in violation of 11 U.S.C. 727(a)(4)(A).  Id. at 682-83.

The bankruptcy court's judgment was affirmed by the District Court and by

the Sixth Circuit Court of Appeals.  Addressing the critical question of the debtor's

interest, the Circuit Court stated:

> A beneficial interest of ownership in the property can be inferred,
> however, from Keeney's payment for and use of the properties,
> including his rent-free residence on each and payment of all mortgage
> obligations.  As noted by the district court, no explanation
> was provided as to why the properties were titled in the parents' names.
> Courts have found that a debtor retained a beneficial interest in
> property under similar circumstances. [Citations omitted].

Id. at 683-84.

The case for the Debtor's beneficial ownership of the Teaneck House is more

compelling.  First, the Debtor exercised the indicia of ownership highlighted in

Keeney.  She lived in the home; Flora, Necifora and Pablo lived in Illinois,

(see 6/24/05 Tr. at 10-11), and never intended to use the house for themselves. The Debtor never paid rent to her parents or Flora. From start to finish, she paid the mortgage and real estate taxes each month as well as the other household expenses. (See 6/24/05 Tr. at 12, 33.) She signed all of the real estate documents freely using Flora's name usually without any evidence of authority. Most importantly, the Debtor retained all of the approximate $130,000 in refinancing and sale proceeds.

Second, the Debtor held herself out as the owner. Dr. Weiss testified, without contradiction, that the Debtor told him several times that she owned the Teaneck House. (6/27/05 Tr. at 27.) It seems that she also represented her ownership to Meritage, the new mortgagee, or Stewart Title, the title insurer. Stewart Title insisted on the 2002 Deed as a condition to insuring title. The 2002 Deed purported to cut off Kupfermunz's possessory rights as "Flora's" husband. Stewart Title's demand implied that the Debtor, posing as Flora, represented that she owned the Teaneck House, and Kupfermunz was her husband.

In addition, she attended various closings masquerading as Flora, the owner. Although she claimed that she produced her own identification at these closings, two facts undercut her testimony. The notarial acknowledgments attest to Flora's presence, not the Debtor's. Moreover, it is difficult to accept that any bank lending $377,000 would allow the Debtor to sign for Flora without a power

23

of attorney based upon an alleged verbal authorization.

Third, the Debtor's parents and Flora acknowledged the Debtor's ownership. Initially, it is beyond cavil that the Teaneck House was purchased to provide a home for the Debtor; Flora and their parents lived in Illinois. In addition, Flora and the widowed Necifora acquiesced in the Debtor's exercise of the use of the proceeds. Necifora knew about the refinancing; the 2002 Deed, which Necifora signed, was done at Stewart Title's insistence as part of that transaction. She knew what the Teaneck House cost in 1998, and she had to know that the refinancing would generate substantial proceeds for the "Borrower." It was no secret that the Debtor got the proceeds; she testified that Flora gifted the near $100,000 to her. It is fair to infer that Necifora knew about the disposition of the proceeds.

The Debtor testified that Flora endorsed the refinancing proceeds check and deposited it in the Debtor's business account as a gift. (See 6/24/05 Tr. at 52.) Therefore, Flora knew about the refinancing and the Debtor's receipt of the proceeds. Flora also knew about the subsequent sale; she executed a power of attorney, an affidavit of title and a 1099-S Reporting Form. According to the Debtor, Flora again graciously gifted all of the proceeds to the Debtor.

I find the testimony regarding Flora's gifts to be incredible. The Debtor was

24

a dentist, without dependents; Flora was a divorced mother of three that apparently did not receive child support. (See 6/24/05 Tr. at 26-27.) Flora's relinquishment of $130,000 of proceeds implied what everyone in the family seemed to acknowledge during the preceding six years – the Debtor owned the Teaneck House.

Why, then, didn't the Debtor's parents simply place title in the Debtor's name? The Debtor's trial testimony supplied the rationale. By the time that the Teaneck House was purchased, the Debtor was already involved in the second of her three bankruptcies in this district. She owed the federal and state taxing authorities substantial sums. She testified that her parents placed title in Flora's name, rather than in the Debtor's or in both the Debtor's and Flora's names, because the Debtor had a bad credit rating. In short, the transaction was set up to place the Teaneck House beyond the reach of the Debtor's substantial creditors.

The Debtor's concealment of her interest in the Teaneck House, in this regard, was consistent with her general pattern of hiding assets from her creditors. For example, she testified that she did not maintain a personal bank account because she was "turned down."[10] (6/24/05 Tr. at 179.) Instead, she deposited the proceeds from the Teaneck House, as well as her personal disability payments, into her corporate account. (See 6/24/05 Tr. at 179-80)

---

[10]    The Fleet Bank account listed in Schedule B was a corporate account.

Her explanation was not credible. At various times during the relevant period, she maintained corporate accounts at Chase Bank and Fleet Bank. (See DX 4.) It is difficult to accept that these banks would take her corporate funds but not her personal funds, or refuse to open a personal account to accommodate her. The lack of a personal account was her choice, not the banks'. She then used her corporate funds to pay her personal expenses. (See 6/24/05 Tr. at 87, 119.)

In fact, she often used more deceptive tactics to conceal her cash. Each month, she cashed her monthly draw as soon as she got it. (See id. at 116.) She used some of the cash to pay her personal living expenses, such as the telephone and other utilities.[11] (See id. at 117.) She also used some of the cash to purchase cashier's or bank checks which, in turn, were used to meet the monthly mortgage payments. (See id. at 117-18.)

In light of these facts, I conclude that the debtor had an equitable interest in the Teaneck House. As noted above, she enjoyed all of the benefits of ownership, and assumed all of the corresponding obligations. In contrast, the titular owners had neither. Her interest became property of the estate upon the commencement of the case, see 11 U.S.C. § 541(a), and the Debtor should have reported that interest in her Schedules. She intentionally failed to do so in order

---

[11]    According to the Debtor, she went to payment facilities in New Jersey where she would remit cash to satisfy her telephone, electric and gas bills. (6/24/05 Tr. at 61 and 117.)

26

to hide her interest from her creditors, a pattern she followed consistently. The Debtor's intentional omission of her equitable interest in the Teaneck House constituted a false oath, and justifies the denial of her discharge under 11 U.S.C. § 727(a)(4)(A).[12]

## C      The Failure to Account for the Proceeds

According to the Debtor, Flora gave her approximately $100,000 – the net proceeds of the January 2003 refinancing – less than three months before she filed her chapter 7 case. The Debtor deposited the refinancing proceeds in her corporate account, and used the funds to construct a new office. She did not reflect her receipt or use of the proceeds in her Schedules or SOFA. Even if the Debtor did not have an interest in the Teaneck House, the transactions surrounding the receipt and the use of the refinancing proceeds should have been disclosed.

Section 521(1) of the Bankruptcy Code directs a debtor to "file a list of creditors, and unless the court orders otherwise, a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs." Accord FED. R. BANKR. P.

---

[12]      The Debtor's concealment of her interest in the Teaneck House, and her deposit of the proceeds in her corporate account, also constituted the concealment and ultimate transfer of her property with fraudulent intent in violation of 11 U.S.C. § 727(a)(2). I do not, however, read the complaint, Joint Pre-Trial Order or the plaintiff's post-trial submissions to rely on such a theory. Hence, it does not form any basis for the decision to revoke the Debtor's discharge.

1007(b)(1)("Except in a chapter 9 municipality case, the debtor, unless the court orders otherwise, shall file schedules of assets and liabilities, a schedule of current income and expenditures, a schedule of executory contracts and unexpired leases, and a statement of financial affairs, prepared as prescribed by the appropriate Official Forms.")  The Official Forms used for reporting the debtor's financial information include the Schedules (Official Form No. 6) and the SOFA (Official Form No. 7).

The Plaintiff contends that the Debtor failed to report Flora's $100,000 gift as "income other than from employment or operation of business" in ¶ 2 of the SOFA.  The Bankruptcy Code does not define "income," but the term generally refers to "[t]he money received or other form of payment one receives, usu. periodically, from employment, business investments, royalties, <u>gifts</u> and the like." BLACK'S LAW DICTIONARY 778 (8th ed. 2004)(emphasis added).

The cases disagree on how to define "income" under the Bankruptcy Code. Some courts follow a strict tax law analysis in which the definition of "income" is borrowed from the Internal Revenue Code ("Tax Code"), § 102, which states that "gross income" does not include the value of property acquired by gift, bequest, devise or inheritance.[13]   <u>See</u> <u>In re Wagner</u>, 808 F.2d 542, 549 (7th Cir.

---

[13]   Gross Income is defined by § 61(a) of the Tax Code, with § 102 providing certain exceptions.  The pertinent text of those sections is as follows:

1986)(Posner, J.)("gross income" within Bankruptcy Code's definition of "farmer," is to be given same meaning that it has in the Tax Code, reasoning that use of the Tax Code definition would avoid uncertainty); <u>Cadle Co. v. King (In re King)</u>, 272 B.R. 281, 293 (N.D. Okla. 2002)(applying the tax definition of "gross income" to determine whether transfers to the debtor constituted "gross income" or "income" that had to be disclosed in the debtor's bankruptcy schedules and statement of financial affairs); <u>In re Lamb</u>, 209 B.R. 759, 760-61 (Bankr. M.D. Ga. 1997)(since Congress drafted both the Tax Code and the Bankruptcy Code, it is logical that Congress intended the term "gross income," within the Bankruptcy code's definition of "farmer," to have its ordinary Tax Code meaning); <u>In re Stones</u>, 157 B.R. 669, 670 (Bankr. S.D. Cal.1993) (<u>bona fide</u> loan is not "income" under Tax Code and, therefore, not included within "disposable income" for chapter 13

---

§ 61. Gross Income

(a) General definition.--Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

(1) Compensation for services, including fees, commissions, fringe benefits, and similar items; (2) Gross income derived from business; (3) Gains derived from dealings in property; (4) Interest; (5) Rents; (6) Royalties; (7) Dividends; (8) Alimony and separate maintenance payments; (9) Annuities; (10) Income from life insurance and endowment contracts; (11) Pensions; (12) Income from discharge of indebtedness; (13) Distributive share of partnership income; (14) Income in respect of a decedent; and (15) Income from an interest in an estate or trust.  26 U.S.C.A. § 61(a)(Thomson/West 2005).

§ 102. Gifts and inheritances

(a) General rule.--Gross income does not include the value of property acquired by gift, bequest, devise, or inheritance.  26 U.S.C.A. § 102(a)(Thomson/West 2005).

debtor).  Other courts view the term more broadly in bankruptcy cases.  <u>See</u> <u>In</u>
<u>re Agribank, FCB v. Honey (In re Honey)</u>, 167 B.R. 540, 544 (W.D. Mo.
1994)(rejecting Tax Code approach to defining chapter 12 debtor's "disposable
income" where its application would result in a "profound windfall" to debtor that
received a large non-taxable inheritance); <u>In re Cochran</u>, 141 B.R. 270, 272 (M.D.
Ga. 1992)("income" for purposes of § 1325(c) contemplates a broader definition
than found in the Tax Code.); <u>In re Gage</u>, 159 B.R. 272, 281 (Bankr. D.S.D.
1993)(non-taxable loan proceeds received by a chapter 12 debtor may be included
in determination of "disposable income" under § 1225(b) of the Bankruptcy Code);
<u>In re Martin</u>, 130 B.R. 951, 966 (Bankr. N.D. Iowa 1991)(non-taxable insurance
proceeds received by a chapter 12 debtor during the bankruptcy case is income
for purposes of the disposable income test).  Given this disagreement, and the
absence of clear law in this Circuit, a discharge cannot be denied or revoked based
upon the failure to report a gift as income.


       This conclusion does not, however, end the inquiry.  Even if Flora's
gift did not meet the definition of income, the $100,000 undeniably became the
Debtor's property.  If the Debtor had retained the proceeds in a personal bank
account, she would have had to report it as personal property under Schedule B
(line 2).  Prior to the petition, the Debtor transferred the cash; the transfer simply
transformed the cash into a different asset that still should have been disclosed.

The Debtor deposited the refinancing proceeds into a corporate bank account. The transfer constituted either a loan to her professional corporation or an infusion of equity. A loan should have been reported on Schedule B (line 17). An equity infusion would have increased the value of the Debtor's ownership interest in her professional corporation that should have been reported on Schedule B (line 12). The Debtor did not, however, schedule the stock in her professional corporation as an asset, a separate false oath. In addition, whether viewed as a loan or as capital, the $100,000 transfer occurred outside of the Debtor's ordinary course of business, and should have been disclosed in response to ¶ 10 in the SOFA.[14]

In short, the $100,000 represented the Debtor's most significant asset. The failure to disclose that asset in its original or transformed state made her disclosures materially false. As already noted, the circumstances of the transaction compel the conclusion that the Debtor intentionally hid the receipt and use of the money – as she commonly did with other income and property – to deceive her creditors. Accordingly, the failure to disclose the receipt and transfer of the $100,000 in refinancing proceeds justifies the denial of the discharge under 11 U.S.C. § 727(a)(4)(A).

---

[14]     To the extent the Debtor used the proceeds to prepay rent on the cottage she leased for her personal use, the prepaid rent was an asset that should have been reported on Schedule B, either as a type of security deposit (line 3) or under the catch-all category (line 20).

### D.    The Diamond Engagement Ring

The Debtor also failed to disclose a diamond engagement ring.  The Debtor testified that Kupfermunz, her former husband, gave her a diamond engagement ring of between five and six carats.  (6/24/05 Tr. at 160; see PX 22 at ¶ 8A.)  She further testified that Kupfermunz took back the engagement ring as well as her wedding ring when they separated.  (See id. at 160-61; PX 22, at ¶ 8A).  Given this testimony, it comes as no surprise that she did not schedule a diamond ring.  She scheduled only $3,000 of jewelry, consisting of a "pearl necklace, earrings, necklace & bracelet."  (PX 13, Sched. B, line  7.)

At trial, the fate of the diamond ring had almost as many stories as carats.  Although the Debtor testified that Kupfermunz took the ring back, she stated in a May 5, 2004 affidavit that the ring never existed.  (See 6/24/05 Tr. at 164; 6/27/05 Tr. at p. 85).  At trial, Kupfermunz told a third story.  He testified credibly that he never gave the Debtor a five to six carat diamond ring, and certainly never took one back.[15]  (6/27/05 Tr. at 49, 102.)

Notwithstanding the Debtor's affidavit testimony, I find that the Debtor owned a five to six carat diamond ring.  I further find that Kupfermunz never took it back.  Lacking any other possible explanation, I find that the Debtor still has it,

---

[15]    Kupfermunz testified that he recalled seeing a ring with a bluish stone, but he could not identify the stone.  (6/27/05 Tr. at 61-62.)  During redirect, the Debtor confirmed that the stone was a diamond.  (Id. at 84-85.)

and failed to list it in her Schedules.    Furthermore, in light of the blatantly inconsistent testimony regarding the ring, her overall lack of credibility and her efforts to conceal her assets from her creditors, I find that she intentionally failed to schedule the ring.    Accordingly, I conclude that the failure to schedule the ring constituted a "false oath or account" within the meaning of 11 U.S.C. § 727(a)(4)(A).

## CONCLUSION

Based on the foregoing, the Clerk of the Court is directed to prepare and enter a final judgment revoking the Debtor's discharge.    This opinion constitutes the Court's findings of fact and conclusions of law.

So ordered.

Dated:        New York, New York
              October 14, 2005

                        /s/ *Stuart M. Bernstein*
                        STUART M. BERNSTEIN
                        Chief United States Bankruptcy Judge

33